# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JENNIFER MARINO, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | CIV. A. NO. 1:16-CV-09715 |
| v. | Hon. Jorge L. Alonso<br>*Judge Presiding* |
| POOH-BAH ENTERPRISES, INC. d/b/a VIP'S A GENTLEMEN'S CLUB and PERRY MANDERA, | Hon. Sidney I. Schenkier<br>*Magistrate Judge* |
| Defendants. | |

## REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR CORRECTIVE NOTICE

Defendants' vitriolic opposition to Plaintiff's motion is quite telling. Here, Defendants sent out an updated arbitration agreement in January 2017, and the main change in the agreement was to include officers, directors, and managers like Defendant Perry Mandera. See Dkt. 46-1 at ¶ 10. This revised provision was rolled out just two weeks after the Court took Defendant's Motion to compel arbitration under submission, including Plaintiff's argument that the previous arbitration provision did not cover Defendant Mandera as a non-signatory to the agreement. See Dkt. 25, 26. It is obvious on its face -- and indeed, Defendants do not appear to dispute -- that the 2017 ICA was drafted for the express purpose of avoiding Plaintiff's non-signatory argument and negating any eventual ruling by the Court in Plaintiff's favor on this point. By inducing putative class members to arbitrate their claims against Defendant Mandera without first disclosing the existence of this case or even explaining the differences between this new agreement and the previous agreement, Defendants' conduct was clearly misleading and was calculated to secure unknowing agreements to arbitrate claims against Mr. Mandera from putative class members. The Court should order the issuance of the corrective notice Plaintiff has requested (Dkt. 42, 45-1), which would allow potential class members to now knowingly make a decision as to whether to opt out of arbitration so that they can join this collective action if they choose.

## A. The Court Should Lift the Stay for the Purpose of Ruling on This Motion

Defendants first contend that Plaintiff cannot even seek the relief requested here because of the stay that the Court entered. In other words, Defendants hope that, because the Court ordered a stay before it knew about Defendants' misleading communications attempting to interfere with this collective action, the Court is somehow

1

precluded from taking action now that this conduct has been brought to light (and Plaintiff is precluded from even requesting it). As Plaintiff explained in her Motion, she fully "recognizes that this case is currently stayed, but she respectfully requests that the Court entertain this Motion … because the events giving rise to this Motion -- namely, the distribution of the 2017 ICA in January 2017 -- have only just come to light and present a serious issue that directly affects the integrity of this class action case and putative class members' rights." See Dkt. 42, n.1. Plaintiff brought this issue to the Court's attention as soon as she became aware of it, and she respectfully submits that this new information about the 2017 ICA represents a change in circumstances that warrants the Court's intervention in order to protect the integrity of the collective action process. Defendants are not entitled to use the Court's stay order as a gag order to prevent Plaintiff from addressing their improper behavior. It is of course up to the Court whether to lift the stay and rule on Plaintiff's requested relief.

**B. The Court Should Reject Defendants' Contention That Corrective Notice Should Not Be Issued Because They Claim That Mr. Mandera Will Ultimately Not Be Held Liable as an Employer**

Next, Defendants argue that the Court should not grant Plaintiff's motion because she has not yet proved that Mr. Mandera can be held liable as an employer under the FLSA. This argument clearly puts the cart before the horse. It is well recognized that the usual and proper course of a collective action brought under the FLSA is for the court first to order notice to the putative class in order to allow potential plaintiffs to opt in and *then* for the parties to engage in discovery and merits motion practice. Defendants' action, however, in distributing this new arbitration agreement during the pendency of the case, is a clear attempt not to even allow dancers the opportunity to opt in to the

case, much less to allow them to engage in discovery regarding the merits or Mr. Mandera's potential liability as an employer under the FLSA. Defendants' request that the Court turn the usual order of events in this litigation on its head and allow Defendants to move first for summary judgment on the issue of Mr. Mandera's status as an employer should be flatly rejected. Defendants even try to convince the Court in its opposition to Plaintiffs' corrective notice motion that Mr. Mandera could never be held individually liable in this case, an issue that the Court clearly could not rule on until after discovery and the opportunity for full briefing on the issue – which cannot occur until *after* potential plaintiffs have been given the opportunity to join the case. See, e.g., Deem v. Triplett Striping, Inc., 2012 WL 5353607, at *2 (S.D. Ind. Oct. 30, 2012), report and recommendation adopted, 2012 WL 5845328 (S.D. Ind. Nov. 19, 2012) ("Since [] conditional certification happens before discovery, Plaintiffs' factual allegations are accepted as true").[1]

Moreover, as Plaintiff has noted before, individual owners of defendant businesses have frequently been held to be employers under the FLSA and thus jointly liable for any wage violations. See Dkt. 40 at p. 5, n. 5 (collecting cases). These individuals have included owners of adult entertainment establishments.[2] Moreover, the

---

[1]     Moreover, Defendants' suggestion that the Court address summary judgment prior to allowing dancers to opt-in to this case would violate the one-way intervention doctrine because it would allow opt-in plaintiffs a preview of the strength of these claims before deciding whether to opt in and be bound by the judgment in this case. See Bhattacharya v. Capgemini N. Am., Inc., 2018 WL 1316721, at *11 (N.D. Ill. Mar. 14, 2018) (citing Costello v. BeavEx, Inc., 810 F.3d 1045, 1058 (7th Cir. 2016), cert. denied, 137 S. Ct. 2289 (2017)).

[2]     See, e.g., Miller v. Centerfold Entm't Club, Inc., 2017 WL 3425887, at *7 (W.D. Ark. Aug. 9, 2017) (finding owner of strip club was a joint employer of exotic dancers under the FLSA); McFeeley v. Jackson St. Entm't, LLC, 47 F. Supp. 3d 260, 274 (D. Md. 2014), aff'd, 825 F.3d 235 (4th Cir. 2016) (same); Reich v. Circle C. Investments, Inc., 998 F.2d 324, 329 (5th Cir. 1993) (finding individual to be an employer of exotic dancers under the FLSA even though he "d[id] not have an ownership interest in Circle C and d[id] not control the day-to-day operations

IWPCA defines "employer" to include "any individual . . . acting directly or indirectly in the interest of an employer in relation to an employee." 820 Ill. Comp. Stat. 115/2. Thus, the Court should reject Defendants' argument that it should not even address the serious issue raised by Plaintiff's motion simply because Defendants believe that Mr. Mandera, unlike these other strip club owners, will ultimately not be held liable here.

### C. The Court Should Grant Plaintiff's Request For Corrective Notice

In their Opposition, Defendants insist that corrective notice is not warranted under the standard set forth by the Supreme Court in Gulf Oil Co. v. Bernard, 452 U.S. 89 (1981). However, Gulf Oil and its progeny merely set forth that the Court can limit misleading or abusive communications with potential class members so long as it does so "based on a clear record and specific findings reflecting a weighing of the need for a limitation and the potential interference with the parties' rights." Id. at 90. Using this standard, dozens of courts have enjoined misleading or coercive communications with putative class members and have invalidated arbitration agreements that are rolled out as part of a litigation strategy to defeat a class or collective action. Thus, for the reasons set forth below and contrary to Defendants' contentions, Plaintiff's request for corrective notice under Rule 23(d) is warranted and should be granted.

> **1. Defendants' New Arbitration Agreement Was Not An "Ordinary Business Communication", But Was Instead Part of Defendants' Litigation Strategy To Escape Liability in This Case By Tricking Class Members Into Waiving Their Right to Proceed in Court Against Defendant Mandera**

In their Opposition, Defendants insist that the club's arbitration provision has

---

of Circle C."); Lester v. Agment LLC, 2016 WL 1588654, at *7 (N.D. Ohio Apr. 20, 2016) (finding owner of strip club was a joint employer of exotic dancers under the FLSA); Thornton v. Crazy Horse, Inc., 2012 WL 2175753, at *16 (D. Alaska June 14, 2012) (same); Thompson v. Linda And A., Inc., 779 F. Supp. 2d 139, 152 (D.D.C. 2011) (same).

been in existence for seven years and has been periodically updated such that their attempt to add Mr. Mandera to the agreement's coverage in January 2017 was simply an innocent business decision, undertaken in the ordinary course of business. See Dkt. 46 at 7-8. However, Defendants do not and cannot dispute that the 2017 ICA was revised in *direct response* to developments in this case just a few weeks earlier and that it was presented with the intent of misleading putative class members into agreeing to arbitrate any claims against Mr. Mandera without knowing that there were in fact claims filed on their behalf pending against him in court at that very moment. This blatant gamesmanship is a clear attempt to "unfairly thwart potential [] plaintiffs' ability to [participate]" in pending litigation. Espinoza v. Galardi S. Enterprises, Inc., 2015 WL 9592535, at *3 (S.D. Fla. Dec. 31, 2015). Indeed, a number of courts have recognized that where a defendant distributes an arbitration agreement in the midst of ongoing litigation, which is clearly intended to reduce participation in a class case (as opposed to, for example, merely distributing an arbitration agreement in the ordinary course of business), the defendant's improper motive provides grounds for a court to invalidate the agreement. See id., at *6 (noting that "presentation of agreements to arbitrate disputes …was motivated, at least in part, by the filing of this civil action" and "was intended, at least in part, to dissuade entertainers from participating in this civil action" and invalidating the agreements on these grounds); Williams v. Securitas Sec. Servs. USA, Inc., 2011 WL 2713741, at *3 (E.D. Pa. July 13, 2011) ("Whatever right Securitas may have to ask its employees to agree to arbitrate, its current effort … is confusing and misleading and clearly designed to thwart unfairly the right of its employees to make an informed choice as to whether to participate"); Billingsley v. Citi Trends, Inc., 560 F.

5

App'x 914, 922 (11th Cir. 2014) ("Whatever right Citi Trends may have had to ask its employees to agree to arbitrate, … its effort in the summer of 2012 was confusing, misleading, coercive, and clearly designed to thwart unfairly the right of its store managers to make an informed choice").

For example, in O'Connor v. Uber Technologies, Inc., 2014 WL 1760314, at *6 (N.D. Cal. May 2, 2014), the court distinguished between a defendant who sends out an arbitration agreement "for normal business purposes, and not [as] an attempt to thwart the pending class action lawsuit," as opposed to sending out an agreement in direct response to developments in the litigation as an attempt to limit its liability. The court reiterated that distinction in another order, noting that "[t]here can be little doubt that the purpose of the new Agreement is not purely an isolated business decision but one which is informed by Uber's litigation strategy" and that it was sent as "a direct response to the Court's ruling in the ongoing class action litigation." O'Connor v. Uber Techs., Inc., 2015 WL 9460292, at *2 (N.D. Cal. Dec. 23, 2015), vacated by agreement, 2016 WL 6997166 (N.D. Cal. May 2, 2016). This scenario is in stark contrast to cases where the court found that a defendant's arbitration agreement was disseminated in the ordinary course of business, for example to every new employee as part of initial-hire paperwork.[3]

Here, Defendants sent out an updated arbitration agreement in January 2017,

---

[3]    See, e.g., Balasanyan v. Nordstrom, Inc., 294 F.R.D. 550, 573-74 (S.D. Cal. 2013) ("[T]he court concedes that Nordstrom was engaging in a standard practice that many companies engage in when hiring new employees" and holding that where new employees signed the arbitration agreement in the ordinary course of the established hiring process, the agreements were enforceable); Pablo v. ServiceMaster Glob. Holdings Inc., 2011 WL 3476473, *2 (N.D. Cal. Aug. 9, 2011) ("[T]he Court is faced with evidence that numerous arbitration agreements were signed by defendants and their employees, as well as affidavits stating that defendants have utilized these agreements for at least the past eight years" as opposed to rolling out revised agreements in response to pending class litigation).

and the main change in the agreement was to include officers, directors, and managers like Defendant Perry Mandera. See Dkt. 46-1 at ¶ 10. This revised provision was rolled out just *two weeks* after the Court took Defendant's Motion to compel arbitration under submission, including Plaintiff's argument that the previous arbitration provision did not cover Defendant Mandera as a non-signatory to the agreement. See Dkt. 25, 26. It is obvious on its face -- and indeed, Defendants do not appear to dispute -- that the 2017 ICA was drafted for the express purpose of avoiding Plaintiff's non-signatory argument and negating any eventual ruling by the Court in Plaintiff's favor on this point. By inducing putative class members to arbitrate their claims against Defendant Mandera without first disclosing the existence of this case or even explaining the differences between this new agreement and the previous agreement, Defendants' conduct was clearly misleading and was calculated to secure unknowing agreements to arbitrate claims against Mr. Mandera from putative class members. The fact that Defendants took this action without informing Plaintiff's counsel or the Court until more than a year later, when it sought to use the 2017 ICA to limit their liability, see Dkt. 36, further supports the notion that the 2017 ICA was not drafted in the ordinary course of business but instead was created as a part of Defendants' underhanded litigation strategy. Under these circumstances, Defendants cannot claim in good faith that they simply updated the arbitration provision in the ordinary course of business.

      **2. The Circumstances Surrounding The Presentation of the 2017 ICA Support a Finding That It Was Fatally Misleading, Coercive, And Aimed At Undermining This Litigation, All of Which Supports the Issuance of Corrective Notice**

Defendants assert that courts have "decisively…approved arbitration agreements…enacted during putative collective actions." Dkt. 46 at 8. As the numerous

cases cited in Plaintiff's Motion and this Reply make clear, this assertion is simply not true. Courts have decisively found that defendants *cannot* distribute arbitration agreements during the pendency of putative class or collective actions where those agreements are misleading, coercive, or otherwise interfere with the Court's administration of the class action by eliminating class members' right to participate midstream. Here, all three of those concerns are present, and thus, this Court can and should follow the lead of numerous other courts by issuing corrective notice.

### a. The 2017 ICA is Misleading

Courts have frequently regulated *ex parte* communications with putative class members under Fed. R. Civ. P. 23(d) because of the clear potential for such communications to confuse or mislead potential class members by providing an incomplete or one-sided picture of the facts. Communications can be misleading not only because of misstatements (see Romano v. SLS Residential Inc., 253 F.R.D. 292, 296-97 (S.D.N.Y. 2008) (collecting cases)), but also because of "omissions" and the "failure to provide enough information" to the putative class members about the case so that they could make an intelligent, informed decision about the settlement offer. County of Santa Clara v. Astra USA, Inc., 2010 WL 2724512, at *3 (N.D. Cal. July 8, 2010).

For example, in Piekarski v. Amedisys Illinois, LLC, 4 F. Supp. 3d 952 (N.D. Ill. 2013), the defendant sent out an arbitration provision to putative class members in the middle of a class case by email. The arbitration provision there went so far as to even include a cover letter, "recommend[ing] that the employees read the [Dispute Resolution Agreement] and not[ing] that employees who did not opt-out of arbitration would be barred from participating in any class actions, including the Tompkins action and this

present <u>Piekarski</u> action." <u>Id.</u> at 954. Nonetheless, the court still found the communication was improper because the defendant did not include copies of the relevant court complaints and because the roll-out of the arbitration provision was calculated to reduce participation in the pending lawsuits by confusing and misleading class members. <u>Id.</u> at 956.

Similarly, other courts have taken corrective action where the defendant did not include the plaintiffs' counsel's contact information in their communications to the putative class members. For example, in <u>County of Santa Clara</u>, 2010 WL 2724512 at *1, a consumer class action where a class had not yet been certified, defendants sent refunds to putative class members and informed them that the repayments would be characterized as "accord and satisfaction" of claims related to the class action. The court held, however, that defendants omitted material information because, among other things, "the letter did not contain the complaint or a Ninth Circuit opinion that had approved of plaintiffs' legal theory, did not describe the claim, did not contain the current status of the case, did not provide contact information for the plaintiffs' attorneys." <u>Id.</u> at *6. The court therefore held that "the accord and satisfaction release is invalid in California," and it ordered that "checks cashed will be deducted from any recovery obtain herein . . . by the recipients." <u>Id.</u>[4]

---

[4] <u>See also</u> <u>Slavkov v. Fast Water Heater Partners I, LP</u>, 2015 WL 6674575, *2 (N.D. Cal. Nov. 2, 2015) ("courts may limit communications … especially if they fail to provide adequate information about the pending class action."); <u>Camp v. Alexander</u>, 300 F.R.D. 617, 624 (N.D. Cal. 2014) (invalidating opt-outs obtained through letters that were "entirely one-sided, omitting relevant information regarding Plaintiffs' claims and failing to provide contact information for Plaintiffs' counsel"); <u>Hampton Hardware, Inc. v. Cotter & Co., Inc.</u>, 156 F.R.D. 630, 634 (N.D. Tex. 1994) (holding that class members required protection "from making decisions based upon one-sided information from an interested party ..."); <u>Pollar v. Judson Steel Corporation</u>, 33 FEP Cases 1870, 1870 (N.D. Cal. 1984) (where notice published by defendants did not contain description of claims or contact information for plaintiffs' counsel, court restrained defendant from communicating with class members and issued curative notice).

The Piekarski and County of Santa Clara cases makes clear that, even where defendants disclose pending litigation, this disclosure may not be sufficient without providing an unbiased explanation of the claims (i.e. including a copy of the court complaint and contact information for plaintiff's counsel so that class members can receive both sides of the story). Here, by contrast, the Defendants **did not even mention the existence** of this pending case. Dancers were left completely in the dark about the effect of signing the 2017 ICA, which provided no information about the pending court case and the effect of signing the new agreement. Although Defendants stress that dancers were given an opportunity to opt out of the agreement if they wished, they were given no information as to why they might have reason to opt out, i.e. that a wage case had been filed in court on their behalf which included claims against Mr. Mandera (and which they could only join if they opted out of arbitration). The case law makes clear that this type of conduct is misleading and undermines the integrity of, and the Court's power to oversee, the collective action.

### b. The 2017 ICA is Coercive

The misleading nature of the 2017 ICA alone is sufficient grounds for the Court to order the issuance of corrective notice under Gulf Oil. However, here, the Court could also find that the 2017 ICA is coercive. Courts have recognized that, where there is an ongoing employment or business relationship between the class members and a defendant, *ex parte* communications that affect the class members' right to participate in the class action are inherently coercive because of the power dynamics and economic dependence inherent in the relationship. See, e.g., Ojeda-Sanchez v. Bland Farms, 600 F. Supp. 2d 1373, 1379-80 (S.D. Ga. 2009) ([W]here the . . . class member and the

10

defendant are involved in an ongoing business relationship, such as employer-employee, any communications are more likely to be coercive.") (quoting Belt v. Emcare, Inc., 299 F. Supp. 2d 664, 688 (E.D. Tex. 2003)).[5]

Here, the putative class is plainly economically dependent on Defendants, and this economic dependence gives rise to inherent coercion.[6] Defendants argue that the 2017 ICA cannot be considered coercive because it contains an opt-out provision, see Dkt. 46 at 12. However, Defendants are mistaken. First, it is obvious that dancers would be reticent to opt out of an agreement given to them by the club that they depend upon for their livelihood, where the default option, and thus the club's obvious preference, is for them to not opt out but accept the new agreement that is being presented to them. Courts have recognized this inherent coercion. See, e.g., Gentry v. Superior Court, 42 Cal. 4th 443, 471, (2007) ("[I]t is not clear that someone in Gentry's position would have felt free to opt out. The fact that the arbitration agreement was structured so that arbitration was the default dispute resolution procedure from which the employee had to opt out underscored Circuit City's pro-arbitration stance. Given the

---

[5]    See also Brown v. Mustang Sally's Spirits & Grill, Inc., 2012 WL 4764585 (W.D.N.Y. Oct. 5, 2012) ("Where defendants are also the employers of potential class action plaintiffs, the workplace relationship with the employees and their knowledge of sensitive information about current and former employees, put them in a position to exercise strong coercion in connection with potential class members' decisions . . . ."); Guifu Li v. A Perfect Day Franchise, Inc., 270 F.R.D. 509, 517-19 (N.D. Cal. 2010) (recognizing inherently coercive nature of communications between employer and employees regarding participation in class actions and refusing to honor "opt outs" obtained by employer); Ralph Oldsmobile Inc. v. General Motors Corp., 2001 WL 1035132, at *2 (S.D.N.Y. Sep. 7, 2001) (finding communications coercive because, despite any evidence of actual coercion, class members were economically dependent upon defendant, evincing potential for abuse and grounds for court intervention); Kleiner v. First Nat. Bank of Atlanta, 751 F.2d 1193, 1202 (11th Cir. 1985); In re Currency Conversion Fee Antitrust Litig., 361 F. Supp. 2d 237, 253 (S.D.N.Y. 2005); Hampton Hardware, Inc. v. Cotter & Co., 156 F.R.D. 630, 633 (N.D. Tex. 1994).

[6]    Defendants insist that Plaintiffs have not pointed to specific coercive behavior on their part, see Dkt. 46 at 12, but again, numerous courts have found that the very nature of an ongoing business relationship gives rise to *inherent* coercion.

inequality between employer and employee and the economic power that the former wields over the latter, it is likely that Circuit City employees felt at least some pressure not to opt out of the arbitration agreement.") (internal citation omitted); Jones-Mixon v. Bloomingdale's, Inc., 2014 WL 2736020, at *7-8 (N.D. Cal. June 11, 2014) (finding contract was procedurally unconscionable because it "never explain[ed] the potential disadvantages to arbitration from the employee's point of view," and because the materials make "unmistakably clear that Macy's prefers that employees participate in the arbitration program.") (internal quotations omitted).[7]

Moreover, as noted above, the mere fact that the agreement contained an opt-out provision does not cure the fact that the 2017 ICA is misleading because it does not even mention the pending litigation, much less explain the effect of the amendment to the provision on class members' right to participate in this case, and thus, dancers had no reason to know why it may have been in their interest to opt out of arbitration.

    c. **The 2017 ICA Interferes With The Court's Power to Administer The Class Action By Potentially Eliminating Putative Class Members' Right to Participate**

Finally, this Court's authority under Rule 23(d) to enter a protective order also "extends to communications that interfere with the proper administration of a class action or those that abuse the rights of members of the class." In re Currency

---

[7]    This well-recognized fear of employees going against their employer's wishes has been discussed in cases discussing how fear of retaliation will commonly have a chilling effect on employees' willingness to participate in class litigation. See, e.g., Overka et al. v. American Airlines, Inc., 265 F.R.D. 14, 24 (D. Mass. 2010) ("fear of employer retaliation may have a chilling effect on employees bringing claims on an individual basis."); Perez v. Safety-Kleen Systems, Inc., 253 F.R.D. 508, 520 (N.D. Cal. 2008); O'Brien v. Encotech Const. Servcs., Inc., 203 F.R.D. 346, 350 (N.D. Ill. 2001) (fear of employer retaliation is "a very important concern" because "the nature of the economic dependency involved in the employment relationship is inherently inhibiting.").

Conversion Fee Antitrust Litig., 361 F. Supp. 2d at 252–53.[8] Numerous courts have

held that where an employer proffers documents during the pendency of litigation that

impact the legal rights of employees who stand to benefit as class members from the

litigation, the court should exercise its powers pursuant to Rule 23(d) to not allow those

documents to have such effect. See cases cited in Plaintiff's Motion at p. 6.[9]

      Here, as in the numerous cases cited above, Defendants presented documents

to putative class members that they knew could be used to adversely affect their ability

to participate in this pending litigation. This type of concerted campaign plainly

"interfere[s] with the proper administration of [the] class action" and "abuse[s] the rights

of members of the class." In re Currency Conversion Fee Antitrust Litig., 361 F. Supp.

2d at 252–53. Disseminating a legal document to a putative class member that seeks to

"eliminate putative class members' rights in th[e] litigation", id., is inherently improper --

more so when the document in question is misleading or is presented in a coercive

---

[8]    See also Billingsley v. Citi Trends, Inc., 560 F. App'x 914, 922 (11th Cir. 2014) ("Since the arbitration agreements by their terms will directly affect this lawsuit, the district court had authority to prevent abuse and to enter appropriate orders governing the conduct of counsel and the parties."); Williams v. Securitas Sec. Servs. USA, Inc., 2011 WL 2713741, at *3 (E.D. Pa. July 13, 2011) (same).

[9]    See also Slavkov v. Fast Water Heater Partners I, LP, 2015 WL 6674575, *2, *7 (N.D. Cal. Nov. 2, 2015) (noting that "Courts in this district have limited communications, as well as invalidated agreements that resulted from those communications, when they omitted critical information or were otherwise misleading or coercive" and holding "settlement releases signed by a putative class members … are invalid"); Piekarski, 4 F. Supp. 3d at 955 (refusing to enforce arbitration agreement distributed during pendency of collective action that adversely affected putative class members' right to participate); Balasanyan v. Nordstrom, Inc., 2012 WL 760566, at *4 (S.D. Cal. Mar. 8, 2012) (refusing to compel arbitration after defendant's "improper attempt to alter the pre-existing arbitration agreement with putative class members during litigation"); Williams, 2011 WL 2713741, at *3 (refusing to enforce arbitration agreement distributed during pendency of collective action that adversely affected putative class members' right to participate); Guifu Li, 270 F.R.D. at 518 (refusing to enforce opt-outs signed by employees during the pendency of a class action suit); County of Santa Clara v. Asta USA, Inc., 2010 WL 2724512, *4 -*6 (N.D. Cal. 2010) (refusing to enforce releases of putative class members in a consumer class action through an "accord and satisfaction" which did not contain an explanation of plaintiffs' theory of the case or contact information for plaintiffs' counsel); Freidman v. Intervet Inc., 730 F. Supp. 2d 758, 764 (N.D. Ohio 2010) (invalidating settlement releases obtained from putative class members).

manner, without any meaningful choice. Thus, Defendants' interference with the administration of the class action provides an additional basis for the Court to order the issuance of corrective notice.[10]

Defendants insist that their "roll-out" of the 2017 ICA "is not tantamount to a company-wide campaign to induce putative class members to opt out of this litigation." Dkt. 46 at 12. However, the roll-out of the revised arbitration agreement had exactly that effect, since Defendants were aware that it could use this agreement to attempt to preclude dancers from opting in to the collective action with respect to any claims against Mr. Mandera. The case law does not support the distinction that Defendants try to make between distributing arbitration agreements on the one hand, and releases of substantive claims on the other; on the contrary, courts have consistently found that arbitration agreements that are aimed at affecting whether pending class claims can go forward in court are just as problematic as outright releases, or coercive class action opt-outs, because they are often misleading and they undermine the administration of the class proceeding. See, e.g., Billingsley, 560 F. App'x at 919, 924; Espinoza, 2015 WL 9592535, at *3 (S.D. Fla. Dec. 31, 2015); Jimenez, 2015 WL 4914727, at *6; O'Connor v. Uber Techs., Inc., 2014 WL 1760314, at *6; Piekarski v., 4 F. Supp. 3d at 955; Balasanyan, 2012 WL 760566, at *4 (S.D. Cal. Mar. 8, 2012); Williams, 2011 WL

---

[10] Defendants urge that there is no "fundamental right to participate in class litigation" that would overcome Defendants' right to distribute arbitration agreements to their workers. See Dkt. 46 at 9. However, Defendants' argument misses the point; corrective notice is warranted here, not because the dancers have a fundamental or substantive right to participate in this class case, but rather because they were misled into unknowingly agreeing to the 2017 ICA without understanding its effect on their claims against Mr. Mandera and their right to participate in this case. Unknowing agreements to individually arbitrate claims that are procured through misleading means seriously undermine the collective action, and the Supreme Court has made clear that courts have "both the duty and broad authority" to curtail this type of behavior. Gulf Oil Co., 452 U.S. at 100.

2713741, at *3; In re Currency Conversion Fee Antitrust Litig., 361 F. Supp. 2d at 253.[11]

## CONCLUSION

For all the reasons set forth herein and in Plaintiff's motion, the Court should

order that Plaintiff's proposed corrective notice (Dkt. 45-1) be issued to the putative

class member dancers who received the 2017 ICA in January 2017.

Dated: June 20, 2018                    Respectfully submitted,

                                        JENNIFER MARINO, individually and on
                                        behalf of all others similarly situated,

                                        By her attorneys,

                                        /s/ Shannon Liss-Riordan

                                        Shannon Liss-Riordan, *pro hac vice*
                                        Adelaide Pagano, *pro hac vice*
                                        LICHTEN & LISS-RIORDAN, P.C.
                                        729 Boylston Street, Suite 2000
                                        Boston, MA 02116
                                        Tel. (617) 994-5800
                                        Fax (617) 994-5801
                                        sliss@llrlaw.com; apagano@llrlaw.com

                                        Marc J. Siegel
                                        Bradley Manewith
                                        Siegel & Dolan Ltd.
                                        150 North Wacker Drive, Suite 1100
                                        Chicago, IL 60606
                                        Tel. (312) 878-3210
                                        msiegel@msiegellaw.com
                                        bmanewith@msiegellaw.com

---

[11] Defendants also assert that the law allows them to communicate with putative class members because restrictions on such communications stem from the existence of an attorney-client relationship, which exists only when a dancer opts in to the case or upon class certification under Rule 23. See Dkt. 46 at 10. However, Defendants' argument is beside the point. Plaintiffs are not arguing that Defendants' communications are improper because they involved communication with represented parties; instead, Plaintiffs are arguing that Defendants' roll-out of the 2017 ICA was improper because it was misleading and coercive, and it had a direct impact on dancers' rights in this pending class case. As the cases cited in Plaintiffs' Motion at p. 4 of Plaintiff's Motion make clear, the Court's power to regulate communications with the dancers, even *before* they have opted in, is well established.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 20, 2018, a true and accurate copy of the foregoing

Notice of Motion was filed via this Court's CM/ECF system.

/s/ Shannon Liss-Riordan_____

Shannon Liss-Riordan, Esq.